UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

LIONEL WILLIAMS,

                Petitioner,

      -against-

DONALD J. UHLER,

             Respondent.

-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

25 Civ. 6116 (NSR)(JCM)

To the Honorable Nelson S. Román, United States District Judge:

Petitioner Lionel Williams ("Petitioner"), proceeding *pro se*, filed a petition for a writ of

habeas corpus, pursuant to 28 U.S.C. § 2254, on June 17, 2025 ("Petition").[1] (Docket No. 1). On

January 12, 2026, Orange County District Attorney David M. Hoovler, on behalf of Respondent

Donald J. Uhler ("Respondent"), opposed the Petition. (Docket No. 17). Petitioner filed a reply

on January 29, 2026. (Docket No. 18). For the reasons set forth below, I respectfully

recommend denying the Petition.

## I. BACKGROUND

### A. The Crimes, Arrest, and Investigation

Petitioner's convictions arise out of an incident that occurred shortly after 12:00 a.m. on

---

[1] A *pro se* prisoner's papers are deemed filed at the time he or she delivers them to prison authorities for forwarding to the court clerk. *See Houston v. Lack*, 487 U.S. 266, 270 (1988); *Walker v. Jastremski*, 430 F.3d 560 (2d Cir. 2005) (analyzing the "*Houston* prison mailbox rule"). Petitioner certified that his Petition was delivered to the prison authorities for mailing on June 17, 2025. (Docket No. 1 at 9). Consequently, and because the timeliness of the Petition is not challenged, the Court adopts Petitioner's date for this filing and all other filings discussed herein.

September 17, 2018.[2] (Docket No. 16 ¶ 2).  Prior to the incident, Petitioner and AW[3] were familiar with one another, having met several times around Port Jarvis, but had not previously spent time together. (Trial Tr. at 1006:6-1007:10).[4]  Late on the evening of September 16, 2018, Petitioner messaged AW through Facebook Messenger. (*Id.* at 1007:18-24).  AW informed Petitioner she was an escort and asked if he wanted to "meet up." (*Id.* at 1008:5-6).  Petitioner replied that he did and had $60. (*Id.*).  They agreed to meet at the local bowling alley. (*Id.* at 1008:10).  As AW neared the bowling alley, she received a message from Petitioner telling her to go home. (*Id.* at 1009:13-19).  AW responded that she still wanted to meet but ultimately began walking home. (*Id.* at 1010:8-1011:16).

AW walked for several minutes until she reached an area where the sidewalk ran along the top of a steep, wooded embankment, with no nearby buildings. (*Id.* at 1013:1-11).  Petitioner suddenly grabbed AW from behind, reaching over her right shoulder and taking hold of her left shoulder, effectively placing her in a headlock. (*Id.* at 1013:19-1014:19).  Petitioner then dragged AW off the street and down the slope of the embankment into the brush. (*Id.* at 1015:1-2).

Partway down the embankment, Petitioner pressed AW's face into the ground and pulled her leggings down to her ankles. (*Id.* at 1015:18-1016:2).  Petitioner then resumed dragging AW down to a towpath at the bottom of the embankment. (*Id.* at 1016:4-5).  There, Petitioner completely removed AW's leggings, as well as her shoes and thermal shirt. (*Id.* at 1017:3-24).  Petitioner also took AW's cellphone and tied her shirt around her head, covering her face and

---

[2] The Court construes the evidence presented at trial in the light most favorable to the state. *See, e.g., Murden v. Artuz*, 497 F.3d 178, 184 (2d Cir. 2007).

[3] "In light of New York Civil Rights Law § 50-b, which provides that the identities of the victims of sex offenses be kept confidential by the State," the Court will not refer to the victim by name and instead refer to her only as "the victim" or by her initials, "AW." *Lucidore v. N.Y.S. Div. of Parole*, 209 F.3d 107, 109 n.4 (2d Cir. 2000).

[4] "Trial Tr." refers to the transcript of Petitioner's trial, held from April 26, 2019 through May 9, 2019. (Docket Nos. 21-3 through 21-18).  The Trial Tr. citations herein refer to the pagination of the original transcript.

eyes. (*Id.* at 1017:25-1018:2; 1023:1-19).

AW feared for her life and remained motionless. (*Id.* at 1024:5-10). Petitioner positioned AW on her back and climbed on top of her, using one arm to hold her down. (*Id.* at 1018:10-19). Petitioner attempted to use his other hand to guide his penis into her vagina. (*Id.* at 1018:23-24). Although his penis touched AW's vagina, Petitioner was unable to achieve penetration. (*Id.* at 1019:4-9). Petitioner then flipped AW onto her stomach and again tried to insert his penis into her vagina. (*Id.* at 1019:16-18). No penetration occurred. (*Id.* at 1020:19-20). Petitioner forced AW to stand and bend over beside a tree. (*Id.* at 1021:9-10). From this position, AW observed Petitioner's legs and determined that he was a Black man wearing sneakers. (*Id.* at 1021:11-18). AW also thought Petitioner was wearing basketball shorts or something similar because she could see his legs and felt something with a silky texture. (*Id.* at 1022:19-23). Petitioner again attempted to penetrate AW but was unsuccessful. (*Id.* at 1022:12-13).

After the third attempt, Petitioner handed AW back her leggings, shoes, and phone. (*Id.* at 1023:1-4). AW saw Petitioner run up the embankment and continue back toward the bowling alley. (*Id.*). Then AW put her clothes back on and began walking home. (*Id.* at 1024:24-1025:5). AW called her brother ("RB") and told him she had been raped. (*Id.* at 651:16-652:10). RB told AW to call the police, but she declined at that time. (*Id.* at 652:9-10). The two remained on the phone while AW walked home. (*Id.* at 652:24-25). When AW arrived, RB observed that her clothes were dirty and disheveled. (*Id.* at 653:7-9).

At the house, AW described the incident to RB and RB's girlfriend ("SR"). (*Id.* at 1026:3-4). RB and SR encouraged AW to call the police, but AW was hesitant because she was concerned that the police would take issue with her recent sex work. (*Id.* at 1026:9-17). At around 1:04 a.m. on September 17, 2018, AW called 911 and reached City of Port Jervis Police

Sergeant Robert Card. (*Id.* at 515:18-517:24). AW asked whether she could report having been raped if she did not know the perpetrator's identity. (*Id.* at 1029:20-21). Sergeant Card dispatched officers to AW's home. (*Id.* at 521:3-4).

Officer Daniel Mioglionico met AW on the sidewalk in front of her home. (*Id.* at 526:11-19). He observed that AW was clearly distraught and asked her what happened. (*Id.* at 526:23-24). AW recounted the incident, and Officer Mioglionico asked her to show him where it happened. (*Id.* at 527:8-12). AW agreed, so they got into the patrol car and drove a few hundred yards to the top of the embankment. (*Id.* at 527:14-528:2). From there, AW identified the area of sidewalk where she had been grabbed. (*Id.*). They then walked down a trail along the embankment, where AW showed Officer Mioglionico the spots where Petitioner had attempted to rape her. (*Id.* at 528:11-529:11).

Officer Mioglionico took AW to Bon Secours Community Hospital. (*Id.* at 529:15-16). After explaining what had occurred during the intake process, AW was given a physical examination. (*Id.* at 690:21-693:23). AW appeared anxious and had scratches on both the left and right sides of her back, as well as scabs in various locations on her body and tenderness in her right and left labia. (*Id.* at 694:7-696:9; 732:15-733:4). The doctor then completed a sexual assault evidence collection kit. (*Id.* at 696:10-14).

While at the hospital, Officer Mioglionico had additional conversations with AW and collected her cell phone. (*Id.* at 531:11-532:5). Detective Michael Decker and Officer Mioglionico reviewed the contents of the phone and saw several messages between AW and Petitioner. (*Id.* at 531:11-532:5). Detective Decker asked AW about her conversation with Petitioner. (*Id.* at 749:10-750:24). At that point, AW realized that Petitioner could be the person who attacked her and said "oh, my God, this is the person that did this to me, it makes sense

now." (*Id.* at 750:22-751:5). After her exam concluded, AW returned to the embankment with Officer Mioglionico and Detective Decker, where she showed Detective Decker the locations where the incident occurred. (*Id.* at 753:19-754:9). Officer Mioglionico then brought AW back home, while Detective Decker remained to process the scene. (*Id.* at 541:21-542:5).

After processing the scene, at around 5:40 a.m., Detective Decker drove past the apartment building where Petitioner lived. (*Id.* at 756:22-757:17). Detective Decker saw Petitioner walking up the building's front steps wearing dark colored clothes. (*Id.* at 757:18-758:3). Later, Detective Decker and Detective Sergeant Michael Myers obtained a search warrant for Petitioner's apartment. (*Id.* at 758:4-13). When they drove to the apartment building that afternoon to execute the search warrant, the detectives encountered Petitioner standing on the front porch. (*Id.* at 759:23-24). They approached Petitioner, identified themselves, and explained the matter they were investigating. (*Id.* at 759:25-760:5). Detective Myers advised Petitioner of his *Miranda* rights[5] from memory, after which Petitioner agreed to speak with them. (*Id.* at 760:9-14).

Detective Myers told Petitioner that they were investigating a rape and that he had seen a video of Petitioner following a woman walking in the direction where the incident occurred. (*Id.* at 1118:4-11). Detective Myers suggested that things did not look good for Petitioner. (*Id.*). Petitioner responded that he had planned to rape "her," but ultimately did not go through with it because he became nervous about the possibility of being sentenced to twenty years in prison. (*Id.* at 1118:12-15). When asked what he had been wearing, Petitioner said a Yankees hat, Nike

---

[5] "To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona* ruled that police may not interrogate a suspect who has been taken into custody without first warning the person 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)).

sneakers, shorts, and a shirt. (*Id.* at 1118:16-17).  At that point, the detectives asked Petitioner if he would tell them his side of the story at the police station. (*Id.* at 1122:3-4).  Petitioner agreed. (*Id.* at 1122:6).

Once at the station, Petitioner was reminded of his *Miranda* rights and agreed to speak with the detectives. (*Id.* at 1123:6-13).  Petitioner acknowledged that he texted AW, asked her to meet him in the area of the bowling alley, watched her walk to that location while remaining hidden, and then texted her to go back home. (*Id.* at 762:8-15).  Petitioner further admitted that he then followed AW, grabbed her from behind, and tackled her down the embankment with the intent to rape her. (*Id.* at 762:15-19).  Petitioner stated that after approximately five or ten minutes he came to his senses, realized that he could end up serving twenty years to life in prison, stopped the assault, and ran up the hill without having sexual intercourse with AW. (*Id.* at 762:19-763:4).  Petitioner said that he deleted all the messages with AW on his phone. (*Id.* at 764:9-14).  He also consented to a search of his phone, which the detectives collected as evidence. (*Id.* at 762:15-19).  When asked about the whereabouts of the clothes he had worn, Petitioner gave several different answers before finally telling the detectives that he had discarded them in a dumpster behind the facility where he worked. (*Id.* at 1128:19-1129:17).

The detectives asked Petitioner to provide a written statement. (*Id.* at 846:22-24).  Petitioner demurred and mentioned a lawyer. (*Id.* at 846:25-847:4).  At that point, the detectives stopped questioning Petitioner and left the room. (*Id.*).  After the interview, Petitioner was placed under arrest and photographed. (*Id.* at 779:21-23, 1135:14-15).  The photographs showed that Petitioner had a number of scratches on his thighs. (*Id.* at 1135:23-1136:16).

After the interview, police executed the search warrant at Petitioner's apartment. (*Id.* at 785:24-786:2).  Detective Myers reviewed video footage from Petitioner's workplace. (*Id.* at

1129:22-24).  Although the video showed Petitioner at the facility, it did not show Petitioner placing anything in the dumpster. (*Id.* at 1072:7-23).

Subsequent forensic testing revealed that samples taken from AW's vulva and vagina included sperm and non-sperm fractions of DNA from an unknown male which failed to provide genetic information sufficient for a comparison. (*Id.* at 961:12-962:4).  Three of the samples taken from AW's shirt contained DNA from multiple donors, at least one of whom was male, but none of the male DNA could generate a profile suitable for comparison. (*Id.* at 963:2-19).  A sample from the right front sleeve of AW's shirt included DNA from at least three donors, and both Petitioner and AW were included as potential contributors. (*Id.* at 965:1-7).  The odds of an individual unrelated to Petitioner or AW having a profile that could be included in place of theirs was one in 577.4 billion. (*Id.* at 970:17-23).

## B.  The Indictment

On October 4, 2018, the grand jury returned an indictment charging Petitioner with three counts of attempted rape in the first degree, (Counts 1, 3, and 5), three counts of sexual abuse in the first degree, (Counts 2, 4, and 6), and two counts of tampering with physical evidence, (Counts 7 and 8). (Docket No. 17-1 at 2-4).[6]  Counts 1 through 6 were distinguished by AW's position in relation to Petitioner, with Counts 1 and 2 occurring first when AW was laying on her back; then, Counts 3 and 4 occurred when AW was laying face down; and Counts 5 and 6 occurred after, when AW was standing. (Docket No. 17-3 at 10).

On October 9, 2018, Petitioner appeared before the County Court of the State of New York, County of Orange, for arraignment and entered a plea of not guilty. (Docket No. 16 ¶ 4).

---

[6] All page number citations herein refer to the page numbers assigned upon ECF filing, unless otherwise noted.

## C. Pre-Trial Motions

On November 30, 2018, Petitioner filed a motion ("Omnibus Motion") seeking myriad relief, including the suppression of his statements to the police. (Docket No. 17-1 at 11-13). The Omnibus Motion was supported by the declaration of Petitioner's then-attorney, who argued that the statements Petitioner made to Detectives Decker and Myers "were made involuntarily because [Petitioner] was not adequately advised of his rights to remain silent and/or to have an attorney present with him." (*Id.* at 24). Additionally, Petitioner asserted that law enforcement officers told him "if he were to admit that he committed the crimes alleged in the original felony complaints, that he would be released from custody and free to go." (*Id.*).

In a December 24, 2018 Decision and Order, the trial court granted Petitioner's Omnibus Motion to the extent that it ordered a hearing to "determine the admissibility of statements allegedly made by the defendant." (*Id.* at 51). The hearing was held on March 20, 2019. (Docket No. 21-1). The trial court issued a Decision and Order on April 16, 2019, denying Petitioner's request to suppress the statements, finding that Petitioner "was not in custody when the statements were made," and that "prior to any questioning by the detectives . . . [Petitioner] was advised of and made a knowing, intelligent and voluntary waiver of his rights under *Miranda*." (Docket No. 17-1 at 56).

## D. The Trial and Sentencing

Petitioner's jury trial commenced on April 26, 2019. (Docket No. 21-3). Petitioner testified on his own behalf, asserting that when he messaged AW to cancel their planned meeting at the bowling alley, he was still at home, where he remained until he went to work the following morning. (Trial Tr. at 1315:4-18). Additionally, Petitioner testified that Detective Myers threatened to "bash" his head in and "drag" him off the porch by his neck if he did not confess to

attacking AW. (*Id.* at 1316:17-1317:19).  Petitioner testified that he gave "false" statements to the detectives during their interview because he felt threatened, and Detective Myers said he would be released and face "the least charges" if he told the detectives what they wanted to hear. (*Id.* at 1319:14-1320:16).

On May 9, 2019, the jury found Petitioner guilty of Count 3, attempted rape in the first degree when AW was laying face down, and Counts 7 and 8, tampering with physical evidence as to Petitioner's messages on his cell phone and the clothing he was wearing during the incident. (Docket No. 17-3 at 10).  Petitioner was acquitted of the remaining charges. (*Id.*).

Thereafter, Petitioner moved to set aside the verdict, claiming that "verdict was repugnan[t] and/or the counts in the indictment were multiplicitous, a combination thereof resulting in the [Petitioner] not receiving a fair trial; and a mistrial should have been granted based upon the People's witness violating the [trial court's] prior rulings whereby the jury heard previously stricken evidence resulting in the defendant having been irreparably prejudiced and not having received a fair trial." (Docket No. 17-2 at 5).  On September 10, 2019, the trial court denied the motion. (Docket No. 17-3 at 24-26).

On September 30, 2019, Petitioner was sentenced to a determinate term of imprisonment of fifteen years with a twenty-year period of post-release supervision, as well as consecutive, indeterminate terms of imprisonment of one and one-half to three years on each of the tampering with evidence convictions. (Docket No. 21-2).

**E.  Direct Appeal**

Petitioner filed a direct appeal through counsel on April 5, 2021, arguing that: (1) Count 3 was multiplicitous and should be dismissed; (2) the verdict was not supported by legally sufficient evidence and was against the weight of the evidence; (3) several of the evidentiary

rulings deprived Petitioner of his right to a fair trial; (4) his sentence was excessive; and (5) he was unfairly penalized at sentencing for exercising his right to a trial. (Docket No. 17-3 at 27-97).  On March 15, 2023, the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("Second Department"), affirmed the judgment and sentence. *People v. Williams*, 214 A.D.3d 828, 828 (2d Dep't 2023).  The Second Department found that the three counts charging Petitioner with attempted rape in the first degree were multiplicitous because "all three counts [were] based on a single, uninterrupted incident occurring on the same day during the same time frame." *Id.* at 829.  However, the Second Department determined that issue had "been rendered academic" because Petitioner was convicted on only one of the counts. *Id.*

Petitioner sought leave to appeal the decision to the New York Court of Appeals ("Court of Appeals"). (Docket No. 17-4 at 83-96).  The Court of Appeals denied Petitioner's application on May 18, 2023. *People v. Williams*, 39 N.Y.3d 1158 (2023).

**F.  *Coram Nobis* Application**

On October 11, 2023, Petitioner filed a *pro se* petition for a writ of *coram nobis* to vacate the Second Department's March 15, 2023 decision affirming his conviction and sentence. (Docket No. 17-5 at 2-18).  Petitioner asserted that his appellate counsel was ineffective for failing to challenge the denial of his motion to suppress. (*Id.*).  On April 16, 2025, the Second Department denied Petitioner's application. *People v. Williams*, 237 A.D.3d 980 (2d Dep't 2025).  There is no indication that Petitioner sought leave to appeal that decision to the Court of Appeals.

**G.  Federal Habeas Corpus Proceedings**

On June 17, 2025, Petitioner filed the instant Petition. (Docket No. 1).  Construing the

Petition broadly, *see Williams v. Kullman*, 722 F.2d 1048, 1051 (2d Cir. 1983) (holding that pleading requirements in habeas proceedings should not be "overly technical and stringent"), Petitioner asserts two grounds for relief: (1) the charging indictment contained multiplicitous counts in violation of his state and federal constitutional rights; and (2) he was denied effective assistance of appellate counsel. On January 12, 2026, Respondent opposed the Petition. (Docket No. 17). Petitioner replied on January 29, 2026. (Docket No. 18). At the Court's request, Respondent filed pre-trial hearing, trial, and sentencing transcripts. (Docket No. 21). Thereafter, Petitioner filed a supplementary letter in support of the Petition. (Docket No. 23).

## II. APPLICABLE LAW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996" ("AEDPA"). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). "Before a federal district court may review the merits of a state criminal judgment in a habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254." *Visich v. Walsh*, No. 10 Civ. 4160 (ER)(PED), 2013 WL 3388953, at *9 (S.D.N.Y. July 3, 2013).[7] The procedural and substantive standards are summarized below.

## A. Exhaustion as a Procedural Bar

A habeas petition may not be granted unless the petitioner has exhausted his claims in state court. *See* 28 U.S.C. § 2254(b). As the statute prescribes:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not

---

[7] If Petitioner does not have access to cases cited herein that are available only by electronic database, then he may request copies from Respondent's counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel must provide the *pro se* litigant with copies of such unpublished cases and other authorities as are cited in a decision of the court and were not previously cited by any party.").

be granted unless it appears that–

> (A) the applicant has exhausted the remedies available in the
>      courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process ineffective
>      to protect the rights of the applicant.
>
> . . .
>
> (c) An applicant shall not be deemed to have exhausted the remedies
> available in the courts of the State, within the meaning of this
> section, if he has the right under the law of the State to raise, by any
> available procedure, the question presented.

28 U.S.C. § 2254(b)-(c).

Exhaustion requires a prisoner to have "fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts." *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) (internal quotations omitted). If a petitioner "cites to specific provisions of the U.S. Constitution in his state court brief, the petitioner has fairly presented his constitutional claim to the state court." *Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001); *see also Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir. 1992) (even "a minimal reference to the Fourteenth Amendment" presents a federal constitutional claim to the state courts). A petitioner may fairly present his claim even without citing to the U.S. Constitution, by, *inter alia*: "(a) [relying] on pertinent federal cases employing constitutional analysis, (b) [relying] on state cases employing constitutional analysis in like fact situations, (c) [asserting] . . . [a] claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) [alleging] . . . a pattern of facts that is well within the mainstream of constitutional litigation." *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982). Fair presentation includes petitioning for discretionary review in the state's highest appellate court. *See O'Sullivan v. Boerckel*, 526 U.S.

838, 839-40 (1999) ("a state prisoner must present his claims to a state supreme court in a petition for discretionary review in order to satisfy the exhaustion requirement").

However, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997) (internal quotations omitted). In such cases, although the claim is technically unexhausted, the district court may deem the claim to be exhausted but procedurally barred from habeas review. *See id.* at 140 ("[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies *and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.*'") (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

Under New York law, defendants are permitted only one direct appeal. *See Dasney v. People of the State of New York*, No. 15-cv-5734 (RJS), 2017 WL 253488, at *5 (S.D.N.Y. Jan. 19, 2017) (citing N.Y. Ct. App. R. § 500.20);[8] *see also Roa v. Portuondo*, 548 F. Supp. 2d 56, 78 (S.D.N.Y. 2008) ("Any attempt to raise these claims at this stage as part of a direct appeal would be rejected because a criminal defendant is entitled to only one direct appeal and one application for leave to appeal to the Court of Appeals."). Petitioners must raise record-based claims by direct appeal rather than by a collateral motion in state court. *See, e.g.*, *O'Kane v. Kirkpatrick*, No. 09 Civ. 05167 (HB)(THK), 2011 WL 3809945, at *7 (S.D.N.Y. Feb. 15, 2011) ("[A]ll claims that are record-based must be raised in a direct appeal. . . . It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by

---

[8] This rule states, in relevant part, that a letter application for leave to appeal "shall indicate . . . (2) that no application for the same relief has been addressed to a justice of the Appellate Division, as *only one application is available*." N.Y. Ct. App. R. 500.20(a)(2) (emphasis added).

bringing a claim under CPL § 440.10."), *report and recommendation adopted*, 2011 WL 3918158 (S.D.N.Y. Aug. 25, 2011); *Lowman v. New York*, No. 09-CV-0058T (MAT), 2011 WL 90996, at *9 (W.D.N.Y. Jan. 11, 2011) ("Collateral review of this claim—by way of another CPL § 440 motion—is also barred because the claim is a matter of record that could have been raised on direct appeal, but unjustifiably was not.").[9]

To avoid the procedural default of an unexhausted claim, a petitioner may show "cause for the default and prejudice, or that failure to consider the claim will result in miscarriage of justice, *i.e.*, the petitioner is actually innocent." *Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir. 2003).

## B.  Adequate and Independent State Grounds as a Procedural Bar

"It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman*, 501 U.S. at 729).  This preclusion applies even if the state court alternatively rules on the merits of the federal claim, so long as there is an adequate and independent state ground that would bar the claim in state court. *See, e.g.*, *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *accord Garcia v. Lewis*, 188 F.3d 71, 76-77 (2d Cir. 1999).

"A state court decision will be 'independent' when it 'fairly appears' to rest primarily on state law." *Taylor v. Connelly*, 18 F. Supp. 3d 242, 253 (E.D.N.Y. 2014) (quoting *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006)).  Typically, a ground is adequate "only if it is based

---

[9] N.Y. C.P.L. § 440.10(2)(c) states, in relevant part, that a court must deny a § 440.10 motion to vacate judgment when "[a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his or her unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him. . . ."

on a rule that is 'firmly established and regularly followed' by the state in question." *Garcia*, 188

F.3d at 77 (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)); *see also Cotto v. Herbert*,

331 F.3d 217, 239 (2d Cir. 2003).  A decision that a state procedural rule is inadequate should

not be made "lightly or without clear support in state law." *Garcia*, 188 F.3d at 77 (internal

quotations omitted).  However, "there are 'exceptional cases in which exorbitant application of a

generally sound rule renders the state ground inadequate to stop consideration of a federal

question.'" *Cotto*, 331 F.3d at 240 (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).  In

determining whether a case is "exceptional" in that the state ground should be held inadequate,

the Second Circuit uses the following factors as "guideposts":

> (1) whether the alleged procedural violation was actually relied on
> in the trial court, and whether perfect compliance with the state rule
> would have changed the trial court's decision; (2) whether state
> caselaw indicated that compliance with the rule was demanded in
> the specific circumstances presented; and (3) whether petitioner had
> substantially complied with the rule given the realities of trial, and,
> therefore, whether demanding perfect compliance with the rule
> would serve a legitimate governmental interest.

*Id.* (internal quotations omitted).

To avoid a procedural default based on independent and adequate state grounds, a

petitioner must "show 'cause' for the default and 'prejudice attributable thereto,' . . . or

demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of

justice.'" *Harris*, 489 U.S. at 262 (quoting *Murray v. Carrier*, 477 U.S. 478, 485, 495 (1986)).

**C.  AEDPA Standard of Review**

When a federal court reaches the merits of a habeas petition, AEDPA prescribes a

"highly deferential" standard for reviewing state court rulings. *Lindh v. Murphy*, 521 U.S. 320,

333 n.7 (1997); *see also Fischer v. Smith*, 780 F.3d 556, 561 (2d Cir. 2015).  An application for a

writ of habeas corpus:

- 15 -

shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

Courts have interpreted the phrase "adjudicated on the merits" in AEDPA as meaning that a state court "(1) dispose[d] of the claim on the merits, and (2) reduce[d] its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (internal quotations omitted). Courts examine the "last reasoned decision" by the state courts in determining whether a federal claim was adjudicated on the merits. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

If a state court adjudicates a federal claim on the merits, the Court must apply AEDPA deference to that state court ruling.[10] 28 U.S.C. § 2254(d)(1)-(2).  In the context of AEDPA deference, the phrase "clearly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme Court of the United States'] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 365 (2000).  "A state court decision is contrary to such clearly established federal law if it 'applies a rule that contradicts the governing law set forth in the Supreme Court's cases' or 'if the state court confronts a set of facts that are

---

[10] If, by contrast, a state court does not adjudicate a federal claim on the merits, "AEDPA deference is not required . . . [and] conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo." *DeBerry v. Portuondo*, 403 F.3d 57, 66-67 (2d Cir. 2005).

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent.'" *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (quoting *Boyette v. Lefevre*, 246 F.3d 76, 90 (2d Cir. 2001)).  A state court decision involves an "unreasonable application" of Supreme Court precedent if: (1) "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than "incorrect or erroneous" – it must have been "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of [the state court's] decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  However, "the trial court's decision need not teeter on 'judicial incompetence' to warrant relief under § 2254(d)." *Alvarez v. Ercole*, 763 F.3d 223, 229 (2d Cir. 2014) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).  If a state court decision does not contain reasons for the dismissal of a defendant's federal claim, the court must "consider 'what arguments or theories . . . could have supported[] the state court's decision,' and may grant habeas only if 'fairminded jurists could [not] disagree that those arguments or theories are inconsistent with the holding in a prior decision of' the Supreme Court." *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (alterations in original) (quoting *Harrington*, 562 U.S. at 102).

When reviewing an application for a writ of habeas corpus, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting the state court's factual holding by "clear and convincing evidence." *Id.*; *see also Chapman v. Vanzandt*, No. 96 CIV. 6940 (JGK), 1997 WL 375668, at *4 (S.D.N.Y. July 8, 1997).

## III. DISCUSSION

Petitioner asserts two grounds for relief. (Docket No. 1). First, Petitioner claims the charging indictment contained multiplicitous counts and that submission of those multiplicitous counts to the jury violated his rights to due process and a fair trial. (*Id.* at 5). Second, Petitioner alleges he was denied effective assistance of appellate counsel because his attorney failed to argue that Petitioner's statements to law enforcement should have been suppressed. (*Id.* at 7).

Respondent argues that the Petition should be denied for several reasons. (Docket No. 17). First, Respondent submits that Petitioner's claim regarding the multiplicitous counts is procedurally barred. (*Id.* at 26). Additionally, Respondent contends that this claim was rendered academic and, thus, fails to present a current case or controversy for this Court's consideration. (*Id.*). Second, Respondent asserts that Petitioner's claim that he was denied effective assistance of appellate counsel is unexhausted and meritless. (*Id.* at 34).

For the following reasons, I respectfully recommend denying the Petition in its entirety.

## A. Multiplicitous Indictment

Petitioner claims that his charging indictment improperly contained multiplicitous counts because he was charged with "three of the same identical counts" of attempted rape in the first degree. (Docket No. 1 at 15). Petitioner further asserts that the multiple charges "made it easy for the district attorney to get a conviction." (*Id.*). Additionally, Petitioner contends that if he

had only been charged with one count of attempted rape in the first degree, he would have been acquitted since the jury found him not guilty on two of the three counts. (*Id.*).

Under the Fifth Amendment to the United States Constitution, no person can "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  "An indictment which charges two offenses instead of one for what is the same criminal act, is multiplicitous, and violates the double jeopardy clause." *United States v. Walker*, 314 F. Supp. 3d 400, 407 (E.D.N.Y. 2018) (citing *United States v. Harris*, 79 F.3d 223, 231 (2d Cir. 1996)); *see also United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999) ("This violates the Double Jeopardy Clause of the Fifth Amendment, subjecting a person to punishment for the same crime more than once.").  "Multiplicitous indictments permit a jury to convict a defendant on two counts when doing so would result in two punishments being imposed for the same crime." *United States v. Francis*, 25 Cr. 103 (PGG), 2025 WL 3535166, at *4 (S.D.N.Y. Dec. 9, 2025). "To determine if two counts are multiplicitous, courts analyze 'whether the offenses charged in the various counts are sufficiently distinguishable from one another to permit a reasonable inference that Congress intended to authorize multiple punishments.'" *United States v. Kandic*, 134 F.4th 92, 102 (2d Cir. 2025) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 969 (2d Cir. 1990)).

### 1. Procedural Defect

Respondent contends that Petitioner's multiplicitous indictment argument is procedurally barred from this Court's review because it was already determined to be unpreserved by the Second Department. (Docket No. 17 at 27).  The Second Department held that Petitioner's "contention that the submission of multiplicitous counts to the jury violated his state and federal constitutional rights to a fair trial and due process is unpreserved for appellate review." *Williams*,

214 A.D.3d at 829 (citing N.Y. Crim. Proc. Law § 470.05(2)).  Therefore, the Second Department's holding "is based on independent and adequate state law foreclosing federal habeas relief." *Carson v. McGuinness*, 23 Civ. 6776 (KMK)(JCM), 2024 WL 5469225, at \*9 (S.D.N.Y. Aug. 28, 2024), *report and recommendation adopted*, 2025 WL 3539106 (S.D.N.Y. Dec. 10, 2025).  "[A] state court procedural default will bar habeas review when the last state court rendering judgment in the case clearly and expressly states that its judgment rests on a state procedural bar . . . even where the state court has also ruled in the alternative on the merits of the federal claim." *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (internal quotations omitted); *see also Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810 n.4 (2d Cir. 2000) ("We note that we have held that where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved.") (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir. 1996)).

Thus, although the Second Department went on to substantively consider Petitioner's argument on direct appeal, the procedural default alone is sufficient to bar this Court's review.

## 2. Justiciability

Assuming, *arguendo*, Petitioner had fully preserved his claim regarding the multiplicitous indictment, it would still be denied.  As explained by the Second Department, "the counts charging attempted rape in the first degree (counts 1, 3, and 5) as set forth in the indictment, and as amplified by the bill of particulars, are multiplicitous, as all three counts are based on a single, uninterrupted incident occurring on the same day during the same time frame." *Williams*, 214 A.D.3d at 829.  However, this claim "has been rendered academic because the jury acquitted the defendant of counts 1 and 5." *Id.*

While Petitioner argues his Petition should be granted on the basis of the multiplicitous indictments, "the appropriate remedy [in these circumstances] is to remand to the [trial] court to vacate the multiplicitous counts and to adjust the sentencing accordingly." *United States v. Zvi*, 168 F.3d 49, 57-58 (2d Cir. 1999).  However, remand is not needed here because Petitioner was only convicted on one count of attempted rape in the first degree. (Docket No. 17-3 at 10).  Since there is no remedy for the Court to provide, this claim is moot. *See White v. First Am. Registry*, 230 F.R.D. 365, 367 (S.D.N.Y. 2005) (quoting *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)) ("A claim becomes moot 'when the parties lack a legally cognizable interest in the outcome.'").

Petitioner cites *United States v. Ayers*, 20-cr-239 (BMC), 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024), and *United States v. Bickford*, 23-cr-91 (PKC), 2023 WL 6282913 (S.D.N.Y. Sept. 26, 2023), in support of his argument.  In *Ayers*, the court held that it was "premature to dismiss allegedly multiplicitous counts ahead of trial" because "the proper course of action is to deny the motion to dismiss those charges at this juncture without prejudice to . . . renewal after trial if the jury returns multiple verdicts for any multiplicitous counts." 2024 WL 1158686, at *2. In that case, the court permitted the potentially multiplicitous counts to proceed through trial and instructed that the issue could be revisited if the jury found the defendant guilty on multiple counts. *Id.*  Here, the trial court also allowed the multiplicitous counts to go to the jury, but there was no need to revisit the issue because the jury found Petitioner guilty of only one of the counts he alleges were multiplicitous. (Docket No. 17-3 at 10).

In *Bickford*, the court instructed the government to consent to dismiss one of the multiplicitous counts prior to trial. 2023 WL 6282913, at *3-*4.  However, in doing so, the court acknowledged that "[p]ost-trial vacatur of one of two multiplicitous convictions" would also be

an appropriate remedy. *Id.* Here, there was no need to vacate the conviction, since the jury only found Petitioner guilty of one of the multiplicitous counts.

Accordingly, I respectfully recommend dismissing Petitioner's claim that the indictment improperly contained multiplicitous counts.

## 3. Repugnancy

Although not explicitly argued, the Petition also seems to assert that Petitioner's guilty verdict is repugnant because he was acquitted on two of the three attempted rape counts. (Docket No. 1 at 15).

Under New York law, a repugnant verdict must be set aside "where the defendant is convicted of an offense containing an essential element that the jury has found the defendant did not commit," thus rendering the verdict inherently inconsistent. *People v. Trappier*, 637 N.Y.S.2d 352, 354 (1995). Whether a verdict "is inherently inconsistent [is] viewed in light of the elements of each crime as charged to the jury." *People v. Tucker*, 447 N.Y.S.2d 132, 132 (1981). Here, the verdict is not inconsistent because there is no suggestion that the jury made inadequate findings in acquitting Petitioner on two of the attempted rape charges while convicting him on one. (Docket No. 1 at 15).

Furthermore, "[a] claim of inconsistent or repugnant verdicts" is "entirely an issue of State law," which "presents no issue upon which federal habeas corpus relief could be granted." *Williams v. Artuz*, No. 98CIV7964 (LTS)(DFE), 2002 WL 989529, at *8 (S.D.N.Y. May 15, 2002) (citing *Harris v. Rivera*, 454 U.S. 339, 345 (1981)); *accord Suarez v. Bennett*, 207 F. App'x 114, 116 (2d Cir. 2006) (a federal court is "not permitted to grant habeas [relief] simply because a jury's verdicts are inconsistent."). Accordingly, I respectfully recommend that to the

extent that Petitioner is arguing that the verdict was inconsistent and repugnant, that claim should be dismissed.

## B.  Ineffective Appellate Counsel

Petitioner also alleges that he was deprived of effective assistance of counsel because his appellate counsel failed to assert that his statements to law enforcement should have been suppressed. (Docket No. 1 at 3).  "The Supreme Court has long recognized that 'a person accused of a federal or state crime has the right to have counsel appointed,' and further that 'the right to counsel is the right to the effective assistance of counsel.'" *Coleman v. Racette*, 15 Civ. 4904 (NSR)(JCM), 2019 WL 948401, at *12 (S.D.N.Y. Feb. 27, 2019), *report and recommendation adopted*, 2019 WL 1455171 (S.D.N.Y. Apr. 2, 2019) (quoting *Strickland v. Washington,* 466 U.S. 668, 685-87 (1984)).  To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must demonstrate that: (i) his attorney's performance "fell below an objective standard of reasonableness"; and (ii) there is a "reasonable probability" that, but for counsel's error, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687-89, 693-94.  In applying the *Strickland* standard to the instant claim, the Court's review of appellate counsel's performance must be "highly deferential," and there is a "strong presumption" of attorney competence. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Indeed, "[t]he *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).

Furthermore, appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000).  Often, "[t]his process of 'winnowing out

- 23 -

weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986). In fact, "[f]ailure to raise an argument on appeal constitutes ineffective assistance only when the omitted issue is clearly stronger and more significant than those presented." *Rivera v. Conway*, 350 F. Supp. 2d 536, 546 (S.D.N.Y. 2004); *see also Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); *Lynch*, 789 F.3d at 319 ("An appellate lawyer need not raise every plausible claim and has a wide degree of professional discretion to choose which issues to raise.").

Moreover, the Supreme Court has emphasized that when a petitioner brings a claim for ineffective assistance of counsel, "AEDPA review is doubly deferential, because counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (citation and internal quotations omitted). Put differently, to succeed on an ineffective assistance claim, a petitioner must demonstrate that there is a reasonable probability that the omitted claim would have been successful on appeal before the state's highest court. *See Mayo*, 13 F.3d at 534.

## 1. Unexhausted Remedies

As a threshold matter, Respondent contends that Petitioner's ineffective assistance of appellate counsel claim is unexhausted and, therefore, not appropriate for this Court's review. (Docket No. 17 at 34). Petitioner first raised the argument that his appellate counsel was ineffective for failing to challenge the denial of his motion to suppress in his October 11, 2023 *pro se* petition for a writ of *coram nobis*. (Docket No. 17-5 at 2-18). On April 16, 2025, the Second Department denied that application, finding that Petitioner "failed to establish that he was denied the effective assistance of appellate counsel." *Williams*, 237 A.D.3d at 980. Once

this claim was denied by the Second Department, Petitioner was required to raise it to the Court of Appeals prior to asserting it in the Petition. His failure to do so requires dismissal of the claim. *See Sanabria v. Martuscello*, 15 Civ. 1534 (CS)(LMS), 2019 WL 4942118, at *7 (S.D.N.Y. Oct. 8, 2019) ("If a petitioner fails to present his or her federal constitutional claim to the highest state court able to review it, the claim is unexhausted. Unexhausted claims are not eligible for federal habeas review and should be dismissed") (citations and internal quotations omitted). Therefore, the claim remains unexhausted and not subject to habeas review.

## 2. Appellate Representation

However, assuming, *arguendo*, that Petitioner's ineffective assistance of appellate counsel claim had been exhausted, Petitioner cannot satisfy either prong of the *Strickland* standard. Petitioner argues his appellate counsel failed to assert that Petitioner's statements to law enforcement should have been suppressed. (Docket No. 1 at 3). Petitioner explains that these statements should have been suppressed because he was not advised of his *Miranda* rights once he was at the police station and that he cannot be compelled to be a witness against himself. (*Id.* at 7).

Petitioner raised these arguments in his *coram nobis* application. (Docket No. 17-5 at 9). The Second Department denied that application and found that Petitioner "failed to establish that he was denied the effective assistance of appellate counsel." *Williams*, 237 A.D.3d at 980. The Second Department's decision is entitled to AEDPA deference. *See Degree v. Corey*, 21 Civ. 11012 (CS)(JCM), 2024 WL 947028, at *9 (S.D.N.Y. Jan. 19, 2024), *report and recommendation adopted*, 2024 WL 639474 (S.D.N.Y. Feb. 15, 2024). Additionally, the argument that Petitioner's statements should have been suppressed was rejected by the trial court in its April 16, 2019 decision regarding the Omnibus Order, which held that:

- 25 -

> [T]he defendant's motion to suppress oral and videotaped statements made by the defendant on September 17, 2018 to Detective Decker and Detective/Sergeant Myers is denied on the ground that defendant was not in custody when the statements were made. Assuming that defendant was in custody, prior to any questioning by the detectives relating to the incident under investigation, defendant was advised of and made a knowing, intelligent and voluntary waiver of his rights under *Miranda*.

(Docket No. 17-1 at 56).

Turning to the first prong of the *Strickland* standard, Petitioner has not demonstrated that his appellate attorney's performance "fell below an objective standard of reasonableness." 466 U.S. at 687-89. "When a habeas petitioner alleges ineffective assistance of counsel 'based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Gabbidon v. Lee,* 18 Civ. 2248 (VB)(JCM), 2022 WL 1557272, at \*19 (Mar. 10, 2022) (quoting *Mayo*, 13 F.3d at 533), *report and recommendation adopted*, 2022 WL 1558156 (S.D.N.Y. May 16, 2022). Appellate counsel raised nine arguments on Petitioner's behalf, including that there were multiplicitous indictments, the jury's verdict was against the weight of the evidence, and that a mistrial should have been declared after a detective testified that Petitioner was a sex offender. (Docket No. 17-3 at 34). Petitioner has not shown that the argument that his statements should have been suppressed "is clearly stronger and more significant than those presented" by appellate counsel. *Rivera*, 350 F. Supp. 2d at 546. Therefore, Petitioner has not shown that appellate counsel's performance was unreasonable. *See Strickland*, 466 U.S. at 687-89. Moreover, the trial court already found that Petitioner was properly advised of his *Miranda* rights, and there is nothing to

- 26 -

suggest that appellate counsel was presented with any new information that might prompt the Second Department to reverse that decision. Therefore, the second prong of *Strickland* is also unsatisfied because Petitioner has not established that there is a "reasonable probability" that "the result of the proceeding would have been different" if appellate counsel had raised the argument. 466 U.S. at 693-94.

Petitioner's reliance on *Jackson v. Denno*, 378 U.S. 368 (1964), is misplaced. (Docket No. 1 at 16). In *Jackson*, the Supreme Court considered the constitutionality of allowing a jury to determine if a confession was made voluntarily. 378 U.S. at 376. The jury was not asked to make such a finding in the instant case. Additionally, in his supplemental letter, Petitioner asks the Court to consider the 2012 decision from the Second Department in *People v. Harris*, 93 A.D.3d 58 (2d Dep't 2012). In *Harris*, the Second Department found that "statements that the defendant made to the police . . . should have been suppressed" because they were made after the defendant "unequivocally invoked his right to counsel while in police custody." *Id.* at 70. Therefore, the Second Department granted the defendant's motion to suppress his statements to law enforcement and remanded the matter for a new trial. *Id.* at 75. *Harris* is inapplicable because Petitioner is not asserting that his statements to law enforcement were made after he invoked his right to counsel. Rather, Petitioner argues that he was not given his *Miranda* rights again at the police station. (Docket No. 1 at 16). To the extent that Petitioner argues *Harris* supports his theory that he needed to be *Mirandized* a second time once he was at the police station, Petitioner is incorrect. *See United States v. Martinez*, 916 F. Supp. 2d 334, 352–53 (E.D.N.Y. 2013) ("It is well established that once an arrested person has received a proper *Miranda* warning, the fact that questioning is stopped and then later resumed does not necessarily give rise to the need for a new warning.").

Accordingly, I respectfully recommend that Petitioner's claim that his appellate counsel was ineffective be denied.

## C. Weight and Sufficiency of the Evidence

Although not explicitly addressed in the Petition, Petitioner appears to argue that his conviction was against the weight of the evidence. Petitioner asserts that "in this case the evidence was not overwhelming" because there was "no identification of [Petitioner] made in court," there were no witnesses to the crime, and "the DNA did not put [Petitioner] at the scene." (Docket No. 1 at 16). Additionally, in his Reply, Petitioner maintains that third-party DNA found at the scene proves that he is "actually innocent of the charged crimes." (Docket No. 19 at 2-3). Further, in his supplemental letter to the Court, Petitioner asserts that he should not have been convicted because he was not identified by the complaining witness at trial and his DNA was not found on the lower garments of the complaining witness. (Docket No. 23 at 1).

"A federal habeas court cannot address 'weight of the evidence' claims . . . ." *Douglas v. Portuondo*, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) (quoting *Garbez v. Greiner*, No. 01Civ.9865 (LAK)(GWG), 2002 WL 1760960, at *8 (S.D.N.Y. July 30, 2002)); *see also Mayo v. Burge*, 2003 WL 21767767, at *3 (S.D.N.Y. July 30, 2003) ("Petitioner's claim that the verdict was against the weight of the evidence does not raise a federal question appropriate for habeas review."). Therefore, to the extent Petitioner is arguing that his conviction was against the weight of the evidence, the claim is not cognizable on federal habeas review.

To the extent the Petition includes a sufficiency of the evidence claim, that claim also fails. In evaluating a sufficiency of the evidence claim under the AEDPA, a petitioner "bears a very heavy burden." *Shamsuddin v. Smith*, 578 F. Supp. 3d 328, 338 (N.D.N.Y. 2022) (internal quotations omitted). "[T]he relevant question is whether, after viewing the evidence in the light

- 28 -

most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis added).  A federal court may not overturn a state court decision that rejects a challenge to the "sufficiency of the evidence . . . simply because the federal court disagrees with the state court." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) (highlighting "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.").  The federal court instead may overturn the state court only in the rare case that the state court decision was "objectively unreasonable." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotation omitted).

When considering a sufficiency of the evidence claim, a federal court must first determine the elements of the crime. *See Nunez v. Conway*, 923 F. Supp. 2d 557, 564 (S.D.N.Y. 2013).  To establish attempted rape in the first degree in New York, the prosecution must prove that "the defendant intended and came dangerously close to engaging in forcible sexual intercourse with another person." *People v. Osman*, 228 A.D.3d 1007, 1008 (3d Dep't 2024) (internal citation omitted); *see* N.Y. Penal Law §§ 110.00, 130.35.  "The defendant need not take the final step in completing the crime, but he or she must have 'engaged in conduct that came 'dangerously near' commission of the completed crime.'" *People v. Hiedeman*, 189 A.D.3d 1902, 1904 (3d Dep't 2020).  A person is guilty of tampering with physical evidence when, "[b]elieving that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, he suppresses it by any act of concealment, alteration or destruction, or by employing force, intimidation or deception against any person." N.Y. Penal Law § 215.40.

The Second Department denied Petitioner's sufficiency of the evidence claim, *People v. Williams*, 214 A.D.3d at 829, thus, that ruling is entitled to AEDPA deference, 28 U.S.C. § 2254(d)(1)-(2). Furthermore, based on the evidence at trial, a rational trier of fact could have found Petitioner guilty of attempted rape in the first degree. Messages between Petitioner and AW demonstrate that Petitioner asked AW to meet him near the bowling alley for a sexual encounter. (Trial Tr. at 1006:6-1008:10). Those messages further show that Petitioner cancelled the planned meeting after AW was already near the designated location. (*Id.* at 1009:13-19-1011:16). As AW was walking home, she was attacked. (*Id.* at 1013:1-11-1015:1-2). During the attack, Petitioner attempted to rape AW in three difference positions, but was unable to achieve penetration. (*Id.* at 1015:18-1022:12-13). AW testified that her attacker's clothing and physical description was consistent with Petitioner. (*Id.* at 1021:11-1022:19-23). In addition, Petitioner's DNA was found on the right front sleeve of AW's shirt. (*Id.* at 965:1-7-970:17-23). Photographs further showed that Petitioner had a number of scratches on his thighs. (*Id.* at 1135:23-1136:16). Moreover, Petitioner admitted that he intended to rape AW, but stopped in the middle of assaulting her because he was concerned about his possible prison exposure. (*Id.* at 762:15-19-763:4). Petitioner also said that he deleted all the messages with AW on his phone and discarded the clothing he wore during the attack in a dumpster behind the facility where he worked. (*Id.* at 764:9-14; 1128:19-1129:17). Thus, there was sufficient evidence establishing Petitioner's guilt.

Petitioner's argument that AW did not identify him in Court, (Docket No. 1 at 16), does not change this conclusion. (Docket No. 2 at 11). Where "the jury's decision was largely a matter of choosing whether to believe [the petitioner's] version of the events or to believe the version offered by the State[] [and] [t]he jury chose to believe the State's witnesses," the Court "cannot say that no rational jury could have found guilt beyond a reasonable doubt." *Gruttola v.*

*Hammock*, 639 F.2d 922, 928 (2d Cir. 1981).  Therefore, a rational jury could have found Petitioner guilty of attempted rape in the first degree and tampering with physical evidence, and "this Court cannot substitute its own credibility determinations for that of the jury." *Cruz v. Griffin*, 16 Civ. 8998 (CS)(JCM), 2019 WL 6220806, at *21 (S.D.N.Y. Oct. 24, 2019).

Accordingly, I respectfully recommend that to the extent Petitioner asserts sufficiency and weight of the evidence claims, those claims should be denied.

## IV.  CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Petition be denied.  Further, because reasonable jurists would not find it debatable that Petitioner has failed to demonstrate by a substantial showing that he was denied a constitutional right, I recommend that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

The Clerk of Court is requested to mail a copy of this Report and Recommendation to the *pro se* Petitioner.

## V.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts, the parties shall have fourteen (14) days from the receipt of this Report and Recommendation to serve and file written objections.  If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d).  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Nelson S. Román at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains,

New York 10601, and to the chambers of the undersigned at the same address.

Requests for extensions of time to file objections must be made to the Honorable Nelson S. Román and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated: May 29, 2026
      White Plains, New York

                                **RESPECTFULLY SUBMITTED**:

                                JUDITH C. McCARTHY
                                United States Magistrate Judge